UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ANKUR ROY, | ) | |
| | ) | |
| Petitioner, | ) | 17 C 5217 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Respondent. | ) | |

## Memorandum Opinion and Order

In July 2014, Ankur Roy was convicted under 18 U.S.C. § 1347 of five counts of healthcare fraud. *United States v. Roy*, No. 13 CR 377 (N.D. Ill.), Dkts. 1 (indictment), 98 (verdict). This court sentenced him to 75 months' imprisonment. *Id.*, Dkt. 206. The Seventh Circuit affirmed. *United States v. Roy*, 819 F.3d 998 (7th Cir. 2016).

In July 2017, Roy filed this petition under 28 U.S.C. § 2255, alleging that his trial counsel, Lorenzo Palomares-Starbuck, provided constitutionally ineffective assistance in conducting plea negotiations and that his sentencing counsel, Marcia Jean Silvers, provided constitutionally ineffective assistance during sentencing. Doc. 4. The court granted Roy's request for an evidentiary hearing under 2255 Rule 8. Docs. 19, 21. The hearing took place over two days, Docs. 72-73, and the parties filed post-hearing briefs, Docs. 79-80, 87-88. For the following reasons, Roy's petition is denied and a certificate of appealability will not issue.

### Background

Section 2255(a) provides: "A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States … may move the court which

1

imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a).

"[R]elief under § 2255 is an extraordinary remedy because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007). Such relief is "appropriate only for 'an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice.'" *Harris v. United States*, 366 F.3d 593, 594 (7th Cir. 2004) (quoting *Borre v. United States*, 940 F.2d 215, 217 (7th Cir. 1991)). Under Seventh Circuit precedent, the court must "review evidence and draw all reasonable inferences from it in a light most favorable to the government." *Carnine v. United States*, 974 F.2d 924, 928 (7th Cir. 1992); *see also Messinger v. United States*, 872 F.2d 217, 219 (7th Cir. 1989) (same); *United States v. Smith*, 2017 WL 1321110, at *1 (N.D. Ill. Apr. 3, 2017) (same), *aff'd*, 877 F.3d 720 (7th Cir. 2017). That said, even if the governing standard were more forgiving to Roy and required only that he prove his case under the ordinary civil preponderance of the evidence standard, *see Triana v. United States*, 205 F.3d 36, 40 (2d Cir. 2000), the court still would have found the facts set forth below in this Background section and the Discussion section that follows.

### A. Overview of the Criminal Case

On May 8, 2013, Roy was indicted along with two co-defendants, Dipen Desai and Akash Patel, and was arrested six days later. *Roy*, 13 CR 377, Dkt. 1; Doc. 70-2 at ¶ 4. (Record citations to the docket in this case, 17 C 5217, are Doc. __, while record citations to the docket in the underlying criminal case, 13 CR 377, are Dkt. __.) The indictment charged the defendants—the owners of Selectcare Health, Inc., a registered Medicare provider of outpatient physical and respiratory therapy—with executing a scheme to defraud Medicare and Blue Cross Blue Shield of Illinois ("Blue Cross" or "BCBS") by submitting fraudulent claims for respiratory therapy

services that were never provided. *Roy*, 13 CR 377, Dkt. 1 at 1, 4. Specifically, the indictment alleged that between March 2011 and July 2011, the defendants "sought reimbursement for respiratory services (i) allegedly provided on days that … Selectcare's sole respiratory therapist[] was not working; (ii) for time periods in which the patients were not receiving care from Selectcare; and (iii) for treatment seven days a week for three hours per day, a schedule well in excess of any schedule prescribed for patients at Selectcare." *Id.*, Dkt. 1 at 4-5. (The government later narrowed the time frame to March 2011 through May 2011. Doc. 80-2.) The indictment further alleged that Roy, working with Desai and Patel, submitted fraudulent claims worth slightly more than $4 million, resulting in payments to Selectcare of approximately $2.2 million from Medicare and $320,000 from Blue Cross. *Roy*, 13 CR 377, Dkt. 1 at 5. The indictment also alleged that Roy personally deposited to his account over $440,000 worth of fraudulent proceeds, all in cashier's checks. *Id.*, Dkt. 1 at 12.

Desai and Patel testified at trial that the scheme was Roy's idea. *Id.*, Dkt. 245 at 44-45. (Desai and Patel testified only at trial, and Roy and Palomares testified only at the § 2255 evidentiary hearing, so references to their testimony should be so understood.) As Patel stated in a March 25, 2014 interview with federal investigators, the three borrowed heavily to fund their purchase of the business in September 2006 from its previous owners and their own expansion efforts. Doc. 9-33 at 2-3. Because of personal financial difficulties, Roy also borrowed money from the company for his own use without Desai's and Patel's permission. *Roy*, 13 CR 377, Dkt. 189 at 5; *id.*, Dkt. 245 at 53 (where the court observed in sentencing Roy that he "was more culpable, given that it was his unauthorized loans from the company that led, at least in part, to the company's financial distress, which in turn led to the scheme"). Patel testified that he believed Roy owed him and Desai "upwards of close to $200,000." *Id.*, Dkt. 235 at 20.

Beginning in late 2009, Desai, Patel, and Roy contemplated ending their partnership. *Id.*, Dkt. 235 at 16-17. Consistent with those discussions, Roy was removed as a signatory from Selectcare's primary bank account. *Id.*, Dkt. 235 at 17-19. Desai and Patel formed a separate corporate entity, North Suburban Therapy, to which they planned to transfer Selectcare's Medicare license and other assets. *Id.*, Dkt. 235 at 20-21; *id.*, Dkt. 236 at 16-17. In early 2010, Desai and Patel submitted documents to Medicare indicating that Selectcare's assets had been sold to North Suburban Therapy. *Id.*, Dkt. 235 at 68-78; Doc. 9-33 at 8-10. Medicare did not approve transfer of the license, and the planned separation between Desai and Patel, on the one hand, and Roy, on the other, was never executed before Selectcare was dissolved in late 2011, months after the fraudulent billings had ceased. *Roy*, 13 CR 377, Dkt. 235 at 99-100; *id.*, Dkt. 236 at 17; *see also* 42 C.F.R. § 489.18 (requiring that "[a] provider who is contemplating or negotiating a change of ownership ["CHOW"] must notify CMS [the Centers for Medicare and Medicaid Services]"); Medicare Enrollment Application (CMS-885A) at 5, https://www.cms.gov /Medicare/CMS-Forms/CMS-Forms/downloads/cms855a.pdf (explaining that "[a] CHOW typically occurs when a Medicare provider has been purchased (or leased) by another organization"). Roy testified that he had begun thinking about moving to Miami in early 2011, and in fact moved to Florida permanently in July of that year. Doc. 80-7 at 60.

As the court noted at Roy's sentencing, Desai and Patel testified credibly that "Roy thought that because they were such small players, they were unlikely to get caught." *Roy*, 13 CR 377, Dkt. 245 at 45. Trial evidence showed that the three defendants "took steps to avoid getting caught. They structured the claims to Medicare so as not to draw Medicare's attention. They destroyed Selectcare records … to hide the evidence of fraud. There was shredding." *Ibid*. (Indeed, Roy admitted during the § 2255 evidentiary hearing that he, together with Patel and

Desai, "collectively agreed to destroy the company's records," including hard drives and documents. Doc. 80-7 at 105.) Trial evidence also showed that Roy personally deposited to his own account over $440,000 in fraudulent proceeds, using that money to pay his debt to Selectcare, his student loans, and credit card bills. *Roy*, 13 CR 377, Dkt. 189 at 5.

Having agreed to cooperate against Roy, Desai and Patel each pleaded guilty to one count of healthcare fraud under 18 U.S.C. § 1347. *Id*., Dkts. 57-58 (Patel), 63-64 (Desai). Acknowledging their acceptance of responsibility, their cooperation against Roy, and their efforts to voluntarily disgorge their ill-gotten gains, the court sentenced Desai and Patel to imprisonment terms of 27 months and 30 months, respectively, and ordered both to pay restitution of approximately $2.5 million. *Id*., Dkt. 157; *id.*, Dkt. 245 at 47, 52-56; *id.*, Dkt. 262. The court sentenced Roy to 75 months' imprisonment, ordering restitution in the same amount. *Id*., Dkt. 206.

### B.    Roy's Initial Efforts to Obtain Representation

In July 2012, after learning from Desai that FBI agents were investigating Selectcare's billing, Roy—who has a bachelor's degree from the University of Illinois at Urbana-Champaign and a master's degree from the Massachusetts Institute of Technology ("MIT"), Doc. 80-7 at 81-82—retained Frank Burke, an experienced criminal defense attorney at Seyfarth Shaw LLP, to represent him. *Id*. at 85-86; Doc. 80-18 at ¶¶ 1-4. Roy testified that he was "involved" in hiring attorneys for Selectcare and was referred to Burke by an attorney who had done transactional work for the company. Doc. 80-7 at 83, 87.

In September 2012, Burke participated in a proffer session with prosecutors from the United States Attorney's Office for the Northern District of Illinois. Doc. 80-18 at ¶¶ 10-11; *see also* Gov't Exh. Aug. 2012 Proffer. According to Burke, Maureen Merin—an Assistant United States Attorney assigned to the Selectcare investigation and later to Roy's prosecution team—

"indicated that the government had substantial incriminating evidence against Mr. Roy, that the government had suffered a substantial loss, and would require a felony plea with no agreement on a sentence, and that immunity or a misdemeanor plea were out of the question." Doc. 80-18 at ¶ 11. Roy testified that he accompanied Burke to the United States Attorney's Office but did not participate in the proffer session, and that Burke debriefed him afterwards. Doc. 80-7 at 91-92. Burke's representation of Roy terminated after the proffer session. Doc. 80-18 at ¶ 12. Roy was billed $8,506 for the representation. *Id*. at ¶ 8.

In October 2012, Roy retained a second attorney, Jonathan Feld of Dykema Gossett PLLC. Gov't Exh. Feld Dec. Feld met with Merin the next month to discuss the Selectcare investigation and "the Government's position on his involvement." *Ibid*.; Doc. 80-7 at 94. Roy testified that his "relationship" with Feld was "never … formally … cut off," but that it "[j]ust stopped." Doc. 80-7 at 95. Feld's firm billed Roy $14,699.65, reflecting 31.4 hours of partner and associate time. Gov't Exh. Feld Dec. Roy later contacted a third attorney, but was arrested before he could formally engage that attorney. Doc. 80-7 at 95-96. Roy acknowledged that he discussed the "general topic" of plea agreements with Feld and Burke, *id*. at 123, and stated that the third attorney advised him to plead guilty, Doc. 70-2 at ¶ 5; Doc. 80-7 at 97.

### C. Roy's Initial Contact with Palomares

Roy was arrested in Miami on May 14, 2013 and met Palomares at the Miami Federal Detention Center that day. Doc. 70-2 at ¶ 4; Doc. 80-1 at 132-133; Doc. 80-7 at 42. After his release on bail—with Palomares representing him—Roy met with Palomares on May 15 and signed an engagement letter the next day. Doc. 70-2 ¶ 6; Doc. 80-1 at 134-135; Doc. 80-7 at 47-48. The engagement letter provided that Roy would pay Palomares a flat fee of $75,000 "i[f] the[] case settles before trial," and $125,000 "if the case pr[o]ceeds to trial." Doc. 9-5 at 1; *see also* Doc. 70-2 at ¶ 6; Doc. 80-1 at 136, 152; Doc. 80-7 at 47. Roy paid Palomares a $20,000

retainer by check.  Def. Exh. 7 EL; Doc. 80-1 at 137; Doc. 80-7 at 47-48.  (Two copies of the engagement letter were entered into evidence during the evidentiary hearing—one dated May 15, 2013, Def. Exh. 7 EL (Doc. 9-27), and the other dated May 16, 2013, Def. Exh. 6 EL (Doc. 9-5).  Because they are materially identical as to their key terms, and because there is no dispute as to the amount of the retainer or how it was paid, it does not matter whether the signature on the document dated May 15, 2013 is in fact Roy's signature.)

Palomares testified that he discussed the indictment and the possible penalties Roy would face early in the representation.  Doc. 80-1 at 137-140.  Roy, by contrast, testified that Palomares never discussed those issues with him.  Doc. 80-7 at 65.  Roy avers in his amended § 2255 declaration that he was addicted to alcohol throughout the period during which Palomares represented him.  Doc. 70-2 at ¶ 17; *see also* Doc. 80-7 at 40-41 (testimony regarding addiction).  (The term "avers" in this opinion is used exclusively to refer to statements made in an affidavit or declaration.)

Roy further avers that he told Palomares from the very beginning of the representation that he wanted to plead guilty and "repeatedly asked him to negotiate a plea agreement."  Doc. 70-2 at ¶ 9; Doc. 80-7 at 59; *see also* Doc. 70-3 at ¶ 7 (amended declaration of Roy's wife, Sharmeen Roy).  Roy testified that Palomares instead focused on ways that he could be "acquitted" or have his prison time "minimize[d]."  Doc. 80-7 at 61; *see also* Doc. 70-2 at ¶ 9 (Roy averring that Palomares advised him that a jury trial would result in either an acquittal or a sentence of probation).  Roy also avers that, throughout the representation, Palomares was focused primarily on his campaign to represent Florida's 26th District in the U.S. House of Representatives and not on Roy's defense.  Doc. 9-30; Doc. 70-2 at ¶ 16; Doc. 70-3 at ¶ 11; Doc. 80-1 at 127-128; Doc. 80-7 at 73.  Roy testified that Palomares's "number one priority for

requesting money was for his campaign," Doc. 80-7 at 54, and that Palomares told him that the trial needed to end the week of July 14 "because [Palomares] needed to go back for a campaign event," *id*. at 73-74; *see also Roy*, 13 CR 377, Dkt. 231 at 27 (Palomares telling the court during the final pretrial conference that he hoped that the trial would last only one week because he was "coming up from Florida … and running a campaign"). Roy acknowledged that Palomares would regularly forward him court filings. Doc. 80-7 at 70.

Roy testified that before his next proffer session with the government on January 14, 2014, he had frequent, albeit "fairly minimal," meetings with Palomares. *Id*. at 111-113; *see also id*. at 73 (characterizing Roy's interactions with Palomares as generally "very limited"). Roy stated that he would typically "stop[] by" Palomares's office to pay him, *id*. at 111-112—dropping off either a check or an "envelope" of cash, typically in amounts ranging from $2,000 to $5,000, *id*. at 58—but that they did not discuss his case "in detail," *id*. at 111-113; *see also* Doc. 70-2 at ¶ 7 (Roy averring that he, with help from others, paid Palomares a sum "of well over $150,000, largely in cash"). Roy avers that, "[f]rom the day [he] signed Mr. Palomares-Starbuck's engagement letter through the end of [his] trial, [they] met on average once per month, often for [him] to drop off a payment. None of [these] meetings was longer than one hour and most were no longer than 30 minutes." Doc. 70-2 at ¶ 15. Roy further avers that from May 16, 2013 through the end of their relationship, he and Palomares "spent … no more than 10 hours discussing the substance of" his case. *Ibid*. Roy admitted that he oftentimes would not scroll down on his phone to read Palomares's emails. Doc. 80-7 at 125-126.

Palomares, by contrast, testified that the two "talk[ed] back and forth every day," though he agreed that Roy would hand deliver his checks. Doc. 80-1 at 187; *see also id*. at 152 (noting that the arrangement was that Roy would pay in "weekly" or "monthly" installments).

Moreover, Palomares testified that beginning in January 2014 and continuing through May 2014, he "set up a cubicle in [his] office" to enable Roy to review the government's discovery: "Roy would come in and look at … [the documents the government produced], and I would look at them." *Id*. at 159. Palomares added that Roy was in his office "regularly" during this period, "talking about the case and bringing me things," including documentation of when he moved to Miami. *Id*. at 159-160.

From May 2013 through July 2014, Roy's wife Sharmeen drafted at least 20 checks to Palomares in amounts ranging from $2,500 to $20,000; Roy's mother, Perfula Patel, also wired $10,000 to Palomares. Gov't Exh. Payments to Palomares; Doc. 80-1 at 153-154; Doc. 80-7 at 58. (The court excludes from consideration a payment to Palomares ostensibly on Roy's behalf from an individual named Jamal Rashid, whom Roy testified he does not know. Doc. 80-7 at 55.) In sum, Roy paid Palomares over $100,000 in attorney fees, plus an unspecified amount of travel expenses, printing charges, and other costs. Doc. 80-1 at 155; Doc. 80-7 at 52.

Roy avers that Palomares "never sent [him] a document showing the amount of time he spent on [Roy's] case or describing the work that he did for the case" and never sent him a bill. Doc. 70-2 at ¶ 8. "Instead, [Palomares] periodically would orally request that [Roy] pay him a certain amount of money, saying on many such occasions that he needed the money to fund his campaign for Congress." *Ibid*.; *see also* Doc. 80-7 at 53 (Roy testifying that Palomares would "request money as needed," usually by phone). According to Roy, Palomares never gave him receipts for the payments. Doc. 80-7 at 120.

Palomares kept no contemporaneous records of the time he spent on Roy's case, but instead attempted to reconstruct his work at the request of Roy's § 2255 counsel. Doc. 80-1 at 94-95. At the evidentiary hearing, Roy's § 2255 counsel questioned Palomares at length about a

document that he created to summarize the time he spent on Roy's case. Doc. 80-10. Roy contends that Palomares created the document "in an attempt to defend himself against [Roy's] ineffective assistance claims by fabricating purported documentation of events that never happened." Doc. 79 at 8.

The court finds that Palomares edited this document—ostensibly reflecting the time he spent on Roy's case—after Roy's § 2255 petition was filed. Palomares acknowledged that he did not keep "time slips" because of the flat fee structure and that he prepared the time records document "from sometime in early 2017 to late 2017." Doc. 80-1 at 233. Palomares testified that he reconstructed his time entries in part based on the docket in Roy's criminal case and from emails and correspondence, *id.* at 234-235, and at least some of the entries appear to be taken verbatim from emails to Palomares from the prosecution team. The court finds that, although the court ordered Palomares after the April 5, 2018 hearing to produce "a copy of the email" he sent to himself attaching his reconstructed time records for his work on Roy's case, *United States v. Roy*, 18 C 2223 (N.D. Ill.), Dkt. 26, Palomares did not do so, Doc. 80-1 at 96-98.

The court nevertheless declines Roy's request to sanction Palomares for his failure to produce the email. There do not appear to be any material differences between the time calculations Palomares provided Roy's § 2255 counsel on February 5, 2018 and what he produced on April 6, 2018, *compare* Def. Exh. 14 PDF, *with* Def. Exh. 15 PDF, and there is thus no evidence that Palomares gained any advantage by failing to produce the email, particularly as it does not represent contemporaneous evidence of the time that Palomares spent working on Roy's case. Under the facts and circumstances presented, the court does not find that Palomares acted in bad faith in failing to produce the email.

### D.    Palomares's Initial Contacts with the Prosecution

Between May 2013 and January 2014, Palomares emailed Merin several times.

Palomares focused on potential weaknesses in the government's case, including Desai's and Patel's credibility and evidence that Roy had severed his ties with Desai, Patel, and Selectcare before the fraud scheme began—stressing in particular the importance of documentation submitted to Medicare concerning the sale of Selectcare's assets to North Suburban Therapy. Doc. 80-1 at 37-38 (Palomares testifying that "the billings … had taken place after [Roy] had moved to Florida. … [W]hen Mr. Roy moved to Florida … his ex-partners went through the sky and started billing Medicare for services that were not rendered"); *id*. at 40-44 (Palomares describing documents seeking to transfer ownership of Selectcare to Desai and Patel). Palomares testified: "[Roy] told me … that we were going to see how we could … try to defend the case based on the fact that … most of these events happened while he was in Miami." *Id*. at 139; *see also id*. at 149 ("Roy had told me that he'd come to Miami before all of these billings."). Roy disputed Palomares's account, testifying that his move to Miami took place after the fraud scheme was complete. Doc. 80-7 at 60.

Palomares also testified that he and Roy discussed the credibility of Kasha Malinowska—Selectcare's respiratory therapist—who had told government investigators that, starting in late February or early March 2011, she "began noticing all three owners working on billing every day." Doc. 80-17 at ¶ 10; Doc. 80-1 at 52-53. Palomares testified that Roy "told [him] that she was a disgruntled employee." Doc. 80-1 at 53.

Roy testified that, despite his own stated wish to plead guilty, Palomares "felt very strongly that we had to go to trial" given the above-described weaknesses in the prosecution's case and the possibility of an alternative loss calculation, whereby the losses attributable to Roy would be limited to the fraudulent proceeds he personally deposited, rather than the total amount

billed. Doc. 80-7 at 64. Palomares, by contrast, testified that his purpose during this time was to "convince" prosecutors "to reconsider this case in some form or another"—that is, to generate leverage to obtain a better plea deal for Roy—and to establish a rapport with the prosecution team. Doc. 80-1 at 150; *see also id.* at 66, 143-145, 231. Palomares testified further that Roy was unwilling to plead guilty to healthcare fraud because "he would have been barred from any further healthcare services businesses," *id.* at 182, and that Roy would not plead if the sentence would be longer than twelve to twenty-four months' imprisonment, having initially resisted an agreement to any prison time at all, *id.* at 117, 180, 190.

As Roy acknowledged, Doc. 80-7 at 113-114, the emails between Palomares and the prosecution team reflect details about Selectcare's business and Roy's co-defendants that Palomares likely obtained from Roy directly, Doc. 80-1 at 141, 147-148, thus calling into question Roy's testimony that the interaction between the two was "minimal," Doc. 80-7 at 59; *see also id.* at 72 (Roy testifying that he spent no more than five to ten hours reviewing evidence with Palomares, that none of the discussions were "strategic," and that Roy simply identified types of documents such as billing statements or checks). On May 16, 2013, Palomares emailed Merin: "While it may be early in the case I understand that you may know that the three defendants had split and my client had no access to [Selectcare's] bank account for over a year. I am bring [sic] this up as a plausible cooperation agreement and mitigation … ." Doc. 9-10 at 1. Merin responded: "I am happy to discuss with you any potential cooperation and/or mitigation … although I can make no promises at this early stage." *Ibid.* A day later, Palomares forwarded this email chain to Roy. *Ibid.*

Approximately a month later, on June 12, Palomares emailed Merin to "acknowledge receipt of [the government's] discovery package." Gov't Exh. June 12, 2013 at 1. Palomares

suggested that "both Patel and Desai have provided false information regarding Roy's involvement in the alleged scheme." *Ibid*. He emphasized that the actual QuickBooks accounting files maintained by Selectcare would contradict Desai's and Patel's statements that Roy masterminded the fraud scheme, and he mentioned Patel's "criminal involvement in a ma[j]or interstate bookmaking ring." *Ibid*.; Doc. 80-1 at 145-149. Palomares questioned whether Roy ever "obtained loans from [Selectcare]," and requested evidence "that supports [Desai's and Patel's] allegation that Roy had taken out loans and that was the reason for the fraudulent billings." Gov't Exh. June 12, 2013 at 1. He added that Selectcare's records "would show that any loan taken by Roy was to be paid back with a dividend adjustment in the general ledger from the retained earnings account of the corporation, not by fabricating fraudulent invoices to Medicare." *Ibid*. Palomares also suggested that Roy "left Chicago … prior to the date upon which the indictment alleges was the end of the fraudulent billing." *Id*. at 2; *see also* Gov't Exh. June 14, 2013 (Palomares email purporting to show when Roy moved to Miami and asserting that the prosecution's file "lacks the timing when in fact Mr. Roy moved from Chicago to Miami").

Palomares emailed Merin (bcc'ing Roy) again on August 24, 2013, emphasizing that Roy was "in Florida from April to October [2011] and the filing of corporate dissolution was in the process of being filed by … counsel in Chicago, all the while Dipen [Desai] kept filing claims." Doc. 9-7 at 1. Palomares added that Roy had "no access" to the company's bank account "and was not authorized to sign." *Ibid*. Palomares stated that "[t]hese facts suggest to me that my client was not the leader and had parted ways with the co-defendants," and closed by underscoring Roy's "most sincere interest in doing the right thing." *Ibid*.

### E.    The Government's First Written Plea Offer

Pursuant to a proffer agreement, Gov't Exh. Proffer Letter, government investigators interviewed Roy on January 14, 2014, Doc. 14-3.  Roy avers that Palomares "did not explain the purpose of the meeting to me or prepare me for it, but he told me that whatever I say, I should not admit any wrongdoing and that I should minimize my role in the fraudulent scheme … .  When we got there, I learned that the meeting was something called a 'proffer.'" Doc. 70-2 at ¶ 14.  Palomares, by contrast, testified that he told Roy "to be totally honest" with the government and that the proffer would be "his first opportunity to come clean and have the government sort of start believing our theory of the case."  Doc. 80-1 at 160.  Palomares testified further that he reviewed discovery with Roy before the proffer session.  *Id*. at 158.  According to Palomares, Roy told him that "he [Roy] knew of some other crimes or Medicare fraud cases that he wanted to submit to the government to see if he could obtain a substantial 5K1 type of agreement."  *Ibid*.

A little more than a week later, on January 23, Matthew Madden—another member of the prosecution team—emailed Palomares a draft plea agreement.  Doc. 9-8 at 3-4.  Under the draft's proposed terms, Roy would plead guilty to the first count of the indictment, and the advisory Guidelines range would be 108-135 months' imprisonment.  Doc. 9-11 at 2-3, 11.  Roy testified that he never saw this draft plea agreement until his § 2255 counsel showed it to him.  Doc. 80-7 at 66; *see also* Doc. 70-2 at ¶ 12 (Roy averring that "[u]ntil several months before my Section 2255 motion was filed, I did not know that the prosecutors had ever made a meaningful or specific plea offer of any kind.").  By contrast, Palomares testified that he discussed the draft plea agreement with Roy in his office, though he acknowledged that he did not email Roy a copy.  Doc. 80-1 at 104, 168-169.  According to Palomares, he told Roy that he "would continue … to negotiate with the government to try to see how we could reduce the offense amount."  *Id*.

at 169.  Sharmeen avers that the covering email from Madden to Palomares—"without an attachment or a link indicating that a document is attached"—was in Roy's personal email in-box "as part of a chain."  Doc. 70-3 at ¶ 10.

The government's proposed calculation of the advisory Guidelines range was as follows:

- A base offense level of 6 under § 2B1.1(a)(1)(B) of the United States Sentencing Guidelines ("U.S.S.G").

- An eighteen-level increase under U.S.S.G. § 2B1.1(b)(1)(J) "because the intended loss [was] more than $2,500,000 but less than $7,000,000."

- A two-level increase under U.S.S.G. § 2B1.1(b)(8) "because [Roy was] convicted of a federal health care offense involving a government healthcare program" with a loss to the government exceeding $1 million.

- A two-level increase under U.S.S.G. § 2B1.1(b)(10)(C) "because the offense involved sophisticated means."

- A two-level increase under U.S.S.G. § 2B1.1(11)(A)(ii) "because the offense involved the possession and use of … patients' social security numbers and Medicare identification numbers."

- A two-level increase under U.S.S.G. § 3C1.1 for Roy's obstructing justice by destroying Selectcare's records.

- A two-level increase under U.S.S.G. § 3B1.1(c) because Roy was an organizer of the fraud scheme.

- A two-level decrease under U.S.S.G. § 3E1.1(a) for acceptance of responsibility.

Doc. 9-11 at 9-11.

In his exchanges with the prosecution concerning the draft plea agreement, Palomares contended that the loss should be calculated based not on Selectcare's total fraudulent billings, but on the fraud proceeds that Roy deposited in his personal bank account.  Doc. 80-1 at 83; Doc. 9-8 at 3 (Palomares saying to Madden: "I have [a] problem with the plea agreement particularly the amount of loss … .").  Palomares's view was that Roy's "role in the offense [was limited to] cashing $290,000," reasoning that he was "in Miami during the relative [sic] period of Billings

by the co-defendants and check writing scheme by co defendants." *Ibid*. In response, Madden "suggest[ed]" that the government would "agree to disagree about the amount of loss and [Roy's] role in the offense" and would "reserve its rights on acceptance of responsibility." *Ibid*.

Referencing the attempted transfer of Selectcare's Medicare license to North Suburban Therapy, Palomares argued to the prosecution team that it would have a "big burden … due to the sale instrument filed with Medicare … . The sale transfer was signed by both co-defendants so when they testify [truthfully] at trial they will admit my client was not involved there after [sic]." *Id*. at 2 (first set of brackets in original). Palomares added that he was "looking for a type 'C' plea agreement addressing the amount of what my client cashed in checks." *Ibid*. Madden emailed back: "As a co-conspirator, your client is responsible for the total intended amount of loss during the course of the conspiracy[,] … not just the amount that he cashed. The only losses we included are the billings between March and May 2011. That comes out to more than $4 million in claims and more than $2.5 million in payments." *Ibid*. Madden told Palomares: "We're confident in our ability to prove our case if this goes to trial." *Ibid*. Palomares and Madden then exchanged another round of emails, with both sides effectively restating their respective positions. *Id*. at 1.

### F. The Government's Second Written Plea Offer

On March 11, 2014, the two sides entered into another round of plea negotiations after Madden emailed Palomares a revised draft plea agreement summarizing the parties' areas of dispute. In the covering email, Madden stated: "I added in 'agree to disagree' language on the enhancements where it is my understanding that you want to disagree. I also calculated the Guideline range if you were to prevail on these disputes at sentencing and added that in." Doc. 9-13 at 2. Recognizing that Palomares intended to "contest the amount of loss," Madden added

that he "deleted the portion from the factual basis that noted that the amount of loss was $4 million." *Ibid.*

Roy testified that he did not see the second draft plea agreement until his § 2255 counsel showed it to him. Doc. 80-7 at 66; *see also* Doc. 70-2 at ¶ 12. By contrast, Palomares testified that he gave Roy a copy of the second draft in his office "and explained what [it] was." Doc. 80-1 at 108-110, 174. Although Palomares testified that he did not forward Madden's March 11 email to Roy, *id.* at 108, Sharmeen avers that the email—again "without an attachment or a link indicating that a document is attached"—was in Roy's email in-box. Doc. 70-3 at ¶ 10.

As before, the second draft plea agreement reflected the government's position that the advisory Guidelines range was 108-135 months' imprisonment, with Palomares's position being that the range was 63-78 months. Doc. 9-14 at 11. The revised draft provided that, while "[t]he government's position is that [Roy's base] offense level is increased by eighteen levels" under U.S.S.G. § 2B1.1(b)(1)(J) "because the intended loss is more than $2,500,000 and less than $7,000,000[, t]he defendant's position is that the offense level is increased by 14 levels" under U.S.S.G. § 2B1.1(b)(1)(H) "because the intended loss is more than $400,000 but is less than $1,000,000." *Id.* at 8-9. The revised draft further provided that the parties disagreed about: (1) whether a two-level increase under U.S.S.G. § 2B1.1(b)(7) should apply, given the defense's position that Roy could not be held responsible for more than $1 million in losses to the government; and (2) whether a two-level increase under U.S.S.G. § 3B1.1(c) should apply, given the defense's position that Roy was not an organizer or leader of the fraud scheme. *Id.* at 9-10. Finally, the revised draft provided that under U.S.S.G. § 3E1.1(b), the government would agree to a three-level reduction for acceptance of responsibility if Roy's total offense level were 16 or higher. *Id.* at 10.

After requesting additional discovery from the government, Palomares responded much the same way he had in January: "I have a professional problem with my client accepting the total loss as written on the plea agreement[. M]y client, as in any conspiracy, is liable for [his] role in the offense." Doc. 9-13 at 1. Palomares added: "My client was not involved in the billing, collection and above all receipt of any federal funds. There is simply no foresee-ability by my client of what the co-defendants were doing past March [2011]." *Ibid*.

On March 14, 2014, Palomares emailed Roy to ask for money after one of his checks bounced. Palomares wrote: "Brother I am in real need of $$$$ we have 2 NSF checks how are we going to put up a fight?" Doc. 88-10.

Days later, on March 19, Palomares emailed Madden and Merin with details of Roy's "alibi defense"—specifically, that Sharmeen would testify that "at the time of the … offense … he was in the Greater Miami are[a] in the State of Florida." Gov't Exh. Mar. 19, 2014 at 1:08 p.m. at 1-2. The next day, in response to the government's having provided Palomares with cashier's checks representing proceeds from the fraud that Roy allegedly cashed, Palomares again emailed Madden and Merin, this time telling them that "some … of the checks … contained a fake signature that … does not belong to my client." Gov't Exh. Mar. 20, 2014 at 10:36 a.m. at 1. Later that day, Palomares sent six images of checks that he contended "do not appear to be of Mr. Roy nor an account associated with Mr. Roy." Gov't Exh. Mar. 20, 2014 at 3:19 p.m. at 1. Palomares testified that his purpose in directing the government's attention to those issues was to "try[] to bring down [Roy's] role in the offense, trying to convince [prosecutors] that [their] witnesses were not always the best." Doc. 80-1 at 176.

Palomares emailed Roy again about fees on April 21, 2014, asking whether he could "have money this week" because he had a "deadline," presumably for his congressional

campaign.  Doc. 88-11; *see also* Doc. 88 at 15 (contending that May 2, 2014 was a deadline for Palomares to pay a fee to qualify for the primary).  Roy replied: "I'll definitely drop off a check … ."  Doc. 88-11.

### G.    The Government's Third Written Plea Offer

Palomares restarted plea negotiations at the end of May 2014; he testified that he did so after conferring with Roy.  Doc. 80-1 at 181.  In an email to Merin on May 29, Palomares asked if the government would consider "a superseding complaint to misprision of felony … with full restitution," further proposing that Roy would agree that the loss attributable to him for purposes of sentencing was $350,000—an amount that came closer to reflecting the fraudulent proceeds Roy himself had deposited.  Doc. 9-16 at 4; *see also* Doc. 70-2 at ¶ 9 (Roy averring that Palomares advised him that "the only plea deal that it would make sense to accept would involve something called 'misprision of a felony'"); Doc. 70-3 at ¶ 7 (Sharmeen averring the same).  Palomares wrote: "While [I] understand that you have the codefendnats [sic] my client['s] involvement in the case is minimal even considering your representations to the court."  Doc. 9-16 at 4.  Merin told Palomares that the government would not accept his proposal.  *Id.* at 3.  She suggested that Roy could either "1) plead 'blind' to all counts of the indictment by oral plea or plea declaration or 2) plead pursuant to a plea agreement with the United States."  *Ibid.*

The next day, Palomares forwarded Merin's response to Roy, with "Fwd: Plea offer" in the subject line and "Get ready for trial" in the body of the covering email.  Doc. 80-13 at 1.  Roy testified that he "probably" read only the one-line covering email from Palomares but not the forwarded content and that he understood the covering email to mean that "we were going to trial."  Doc. 80-7 at 127-128.  Roy avers: "[A]fter seeing [the email] at the time, I called [Palomares] to ask what was going on.  Mr. Palomares-Starbuck told me that the prosecutors

'were not playing ball' and reiterated his advice that I had to go to trial unless the prosecutors would let me plea to misprision of a felony." Doc. 70-2 at ¶ 13.

Referencing the attempted transfer of Selectcare's Medicare license to North Suburban Therapy, Roy further avers that Palomares told him that the "'tie in' issue would lead the Court to either dismiss the case or to give me probation if I were found guilty." *Ibid.*; Doc. 70-3 at ¶ 8 (Sharmeen averring the same). Palomares testified, by contrast, that he discussed Merin's response with Roy and explained that "pleading to a straight plea meant that he was pleading to the entire indictment and to all the charges." Doc. 80-1 at 183. Palomares further testified that by "get ready for trial," he "was trying to convey that the government is not going to consider a plea offer that it's [sic] not what they've already said." *Ibid.* Palomares testified that he explained to Roy that the prosecution team's response indicated that "they believed in their case, and they believed they could prove their case at trial." *Ibid.*

Palomares responded to Merin, asking whether the government would accept a deal whereby Roy would plea "to an exact amount of the checks $350,000." Doc. 9-16 at 3. Merin told Palomares that, from the government's perspective, Roy was "entitled to argue … that the full amount of the intended loss was not foreseeable to him for sentencing purposes," but that he would "need to admit facts sufficient to support his conviction for health care fraud—that is, that he knowingly and willfully participated in a scheme to steal money from Medicare and BCBS." *Id.* at 2. Merin then indicated that she could "draft a proposed plea agreement including a disagreement as to the amount of loss." *Ibid.* Palomares responded that the parties could stipulate to the loss amount. *Id.* at 1. Palomares testified that his goal was "to see if we could convince [Merin's] supervisors that we could stipulate to an amount." Doc. 80-1 at 185. Merin emailed back: "We will not stipulate as to the dollar amount of the loss. I may be able to get

approval to 'agree to disagree' in a written plea agreement … [but i]t is the government's position that your client is jointly and severally responsible for the full amount of the intended loss." Doc. 9-16 at 1.

Palomares testified that, based on Merin's response, he told Roy "[t]hat the government was not going to budge from … the 2.5-to-7-million range in the plea agreement as a matter of the loss," and that Roy responded "negative[ly]." Doc. 80-1 at 189. According to Palomares, Roy "was in denial" and continued to insist that Desai and Patel were lying about the extent of his involvement in the fraud scheme. *Id*. at 189-190; *see also id*. at 182 (Palomares testifying that, at that point, Roy was still unwilling to plead guilty to the first count of the indictment).

Around the same time, Palomares forwarded to Roy discovery material from the government concerning Desai's and Patel's statements to the grand jury and to federal investigators. Gov't Exh. May 28, 2014 @ 1:36. In the covering email, Palomares wrote: "Please read about your codefendants." *Ibid*. Palomares testified that he wanted Roy "[t]o confront the fact that we were going to trial and that this evidence was going to be alleged against him." Doc. 80-1 at 178. Palomares also testified that Roy told him again that, "[f]or the most part," Desai and Patel "were lying." *Ibid*. On June 6, 2014, Palomares again emailed Roy about fees, writing, "Brother I need your help," and providing wire instructions. Doc. 88-12.

Palomares resumed email communication with Merin in late June 2014. As in many of his previous emails, he focused on Desai's and Patel's application to transfer Selectcare's Medicare license to their new company, North Suburban Therapy. In an email on June 26, 2014, Palomares referenced a letter addressed to one of the FBI agents involved in the Selectcare investigation from Cahaba Safeguard Administrators, LLC—a company that provides administrative services to the Centers for Medicare and Medicaid Services. Doc. 88-17 at 2.

The letter, dated June 18, 2014, was provided by the government in discovery; it enclosed a CD containing North Suburban's "provider enrollment application." Doc. 80-4. According to the letter, North Suburban's "change of ownership … was never approved by Medicare," and thus North Suburban "never received a tie-in notice from CMS regarding the CHOW" and "voluntarily terminated with Medicare on May 1, 2011." *Ibid*.

Referencing the Cahaba letter, Palomares emailed Merin: "After seeing the June 18 2014 letter from CAHABA and the failure of CMS to tie the sale is the Government going to dismiss this case against Roy? Was the CAHABA information available to the grand jury who indicted?" Doc. 88-17 at 2. According to Palomares, the letter bolstered what he had earlier characterized as Roy's "alibi defense"—that Desai and Patel had undertaken the fraud scheme after they severed ties with Roy. As Palomares testified, the document "show[ed] that Mr. Roy was not involved in the bulk of these fraudulent billings." Doc. 80-1 at 193; *see also id*. at 45 ("My argument to the government was that they did not … have the information or had provided the discovery that tied Mr. Roy's knowledge to those subsequent billings that took place after Mr. Roy was no longer part of the company.").

Merin emailed Palomares back on June 30, emphasizing that "[t]he government [was] most certainly not going to dismiss the case against Roy." Doc. 88-17 at 1. According to Merin: "The letter from Cahaba concerns the application sent in regarding North Suburban Therapy, a company which never came into operation. Selectcare was never sold and instead, it was your client who helped wind down Selectcare's debts and dissolved Selectcare in October 2011." *Ibid*. To the extent Palomares intended to argue at trial that Roy "did in fact sell his shares in Selectcare," Merin requested any documents or other evidence that Palomares planned to use in making that argument. *Ibid*.

Palomares forwarded Merin's email to Roy, with "Fwd: USA v Roy" in the subject line and no additional text. *Ibid*. Palomares testified that he discussed the email with Roy, and that Roy indicated that he was willing to take his chances at trial, given the possibility that the jury might find persuasive testimony from Sharmeen that supported the alibi defense and given the prospect of a prison term of "83 to 105" months. Doc. 80-1 at 193-194.

Merin emailed Palomares again on July 2 after the final pretrial conference, summarizing her "understanding" of Palomares's position that Roy "wished to plead to misprision of felony, or in the alternative, plead guilty to the charged crime with a stipulation that the loss caused by the defendant did not exceed $350,000." Doc. 88-3 at 1; Doc. 88-18 (July 2, 2014 email from Palomares to Merin, stating that Palomares "still support[ed] the fact that justice suggest[s] misprision and restitution"). Merin made clear that "neither of those options were acceptable to the government," but asked whether Roy "would consider a plea to Count One of the indictment, with an agreement to disagree as to the scope of the loss and a motion to dismiss the remaining counts." Doc. 88-3 at 1. Palomares forwarded this email to Roy several minutes later with "Fwd: Follow-up from Pretrial Conference" in the subject line. *Ibid*. Roy testified that he did not remember whether he read this email, but that he "probably skimmed through it." Doc. 80-7 at 128-129. Roy stated that he did not remember reading the first paragraph of Merin's email and that it was his "assumption … that we were just going to trial." *Id*. at 128.

The next morning, July 3, Palomares emailed Merin requesting discovery concerning North Suburban Therapy. Doc. 9-20 at 1. An hour later, Merin emailed Palomares with several "attached draft stipulations," primarily concerning Selectcare records and Medicare and Blue Cross payment data. Doc. 88-6; *see also* Docs. 88-7, 88-8, 88-9 (additional emails to Palomares regarding proposed stipulations).

That afternoon, Palomares emailed Merin to say that Roy still "insists that he will plead to … misprision of felony immediately," but that Palomares was "working with him in getting him to understand the government's position." Doc. 88-2 at 1. Palomares testified that this email was "another pitch to try … to convince [the prosecution team] to provide my client with a better offer, with a better plea." Doc. 80-1 at 180. The email indicated that Palomares had discussed with Roy a "counter offer framework," whereby Roy would plead guilty to the first count of the indictment. Doc. 88-2 at 1; Doc. 80-1 at 112 (Palomares testifying that Roy was "in [his] office that day"); *id.* at 209-210 (same, adding that Roy and Palomares were "discussing … the negotiations, trying to see how we could avoid a trial"). The email further indicated that Roy would agree to a fourteen-level increase of his base offense level under U.S.S.G. § 2B1.1(b)(1)(H), reflecting a loss amount under the then-operative version of the Guidelines from $400,000 to $1 million. Doc. 88-2 at 1. Palomares also indicated that, were he to plead guilty, Roy would benefit from a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. *Id.* at 1-2. As a result, Palomares estimated that Roy's "[a]djusted level" would be 17. *Ibid.* Palomares testified, however, that Roy in fact was not willing at that point to make the plea that Palomares described in his email to Merin, Doc. 80-1 at 199-200, but that he "discussed … with Mr. Roy that the government was not going to be accepting the lesser quantity of the offense, that they wanted him to plead to the amount that was billed, and that they were not going to negotiate anything of the sort that we were offering," *id.* at 116-117.

Palomares forwarded the "counter offer" email to Roy approximately ten minutes later, with "Fwd: US v. Roy, 13 CR 377" in the subject line. Doc. 88-2 at 1. Roy testified that he did not recall whether he and Palomares met on or around July 3, but stated that if they did meet, they did not discuss plea negotiations. Doc. 80-7 at 71. Roy testified further that he did not

recall discussing the "counter offer" that Palomares proposed and that he did not scroll down on his phone to see Palomares's exchange with the prosecution team. *Id*. at 70, 126, 129-130.

Approximately an hour after Palomares's email, Merin responded. Doc. 9-22. Stating that the government could no longer "consider cooperation at this late date," she proposed that if Roy was "willing to plead to count one of the indictment, [the government] would agree to disagree as to the Guidelines." *Ibid*. Merin then outlined the government's position as to the Guidelines calculation, closely tracking the government's earlier offers:

- A base offense level of six under U.S.S.G. § 2B1.1(a)(2).

- An eighteen-level increase under U.S.S.G. § 2B1.1(b)(1)(J) because the amount of loss was between $2.5 and $7 million.

- A four-level increase under U.S.S.G. § 2B1.1(b)(2)(B) because the fraud involved five or more victims.

- A two-level increase under U.S.S.G. § 3B1.1(c) because Roy was an organizer or leader of the fraud scheme.

- A two-level increase under U.S.S.G. § 3B1.3 because, in committing the offense, Roy either abused a position of public or private trust or used a special skill.

*Ibid*. Merin agreed that if Roy were to plead guilty no later than July 10, the government would agree to a three-level reduction for acceptance of responsibility, which would have resulted in a Guidelines range of 87-108 months. *Ibid*.

Palomares forwarded Merin's email to Roy the morning of July 7, a week before trial began on July 14, with "Fwd: US v. Roy 13 CR 377" in the subject line and no additional text. Doc. 70-4 at 2. Palomares testified that he discussed Merin's offer with Roy "[o]n the phone and in person," Doc. 80-1 at 211-212, and that after they discussed the offer "in detail," Roy asked for an emailed copy, *id*. at 122. Later on July 7, Palomares again forwarded Roy Merin's email, this time with "re: US v. Roy 13 CR 377" in the subject line and the following additional text:

"Cant [sic] agree to some stipulations we need to discuss them available 305-666-2887. Please advise when[.]" Doc. 70-5 at 2.

In his opening post-hearing brief, Roy contends that Palomares's second email referred to the *evidentiary* stipulations the government had sent Palomares, not the stipulated *loss amount*. Doc. 79 at 15-16; *see* Docs. 88-6, 88-7, 88-8, 88-9. The court disagrees. Palomares's reference to "stipulations" concerned the government's calculation of the sentencing enhancements that it believed would apply to Roy. Doc. 80-1 at 124-125. For one thing, had Palomares intended to discuss the evidentiary stipulations with Roy, he would have forwarded Roy not an email from Merin containing the government's plea terms, but rather Merin's emails regarding evidentiary stipulations. For another, it is more plausible that the urgency in Palomares's second email to Roy reflects wanting to discuss plea terms, not ministerial issues regarding evidentiary stipulations at trial.

In the initial declaration he submitted to support his § 2255 petition, Roy averred that before filing the petition, he "did not know that the prosecutors had ever made a meaningful or specific plea offer of any kind." Doc. 9-1 at ¶ 12. Months later, after the parties exchanged discovery, Roy submitted an amended § 2255 declaration, which avers that he made a mistake in the initial declaration because he wrongly believed that all of the emails Palomares had sent to him were saved in a "folder titled 'Major' in [his] personal email account (ankurroy@gmail.com) that [he] used throughout the time [Palomares] represented [him]." Doc. 70-2 at ¶ 11; Doc. 70-3 at ¶ 9 (Sharmeen averring the same); Doc. 80-7 at 68 (Roy testifying that "I was under the assumption that I had transferred everything to a folder called 'Major' in my gmail, but I had not done that"). As a result, Roy now concedes that he received from Palomares the government's third written plea offer. Doc. 70 at 2; Doc. 80-7 at 130-131. Nevertheless,

Roy testified that although he received the two July 7 emails from Palomares, he did not scroll down to read the content of the forwarded message from Merin. Doc. 80-7 at 71, 126, 131-132. Roy testified further that he did not discuss the government's offer with Palomares. *Id*. at 71, 132.

Trial began on July 14, 2014 and concluded on July 21, with the jury finding Roy guilty on five counts of healthcare fraud. *Roy*, 13 CR 377, Dkt. 98.

### H. Sentencing

Roy was represented at sentencing by substitute counsel, Marcia Jean Silvers. *Id*., Dkts. 125, 133. The Probation Office's pre-sentence investigation report ("PSR") calculated a total offense level of 30. *Id*., Dkt. 189 at 7. The specific calculation was as follows:

- A base offense level of six under U.S.S.G. § 2B1.1(a)(2).

- An eighteen-level increase under U.S.S.G. § 2B1.1(b)(1)(J) because the amount of loss was between $2.5 million and $7 million.

- A four-level increase under U.S.S.G. § 2B1.1(b)(2)(B) because the offense involved more than fifty victims.

- A two-level increase under U.S.S.G. § 3B1.3 because, in committing the offense, Roy abused a position of public or private trust or used a special skill.

*Ibid*. The PSR's calculation of Roy's total offense level thus largely reflected the government's third plea offer, but without applying the two-level leadership enhancement under U.S.S.G. § 3B1.1(c) or the three-level reduction for acceptance of responsibility.

In her sentencing memorandum, Silvers objected to the PSR's calculation of "the amount of loss," the proposed four-level "enhancement for [the] number of victims," and the proposed two-level "enhancement for abuse of trust or use of [a] special skill." *Id*., Dkt. 193 at 2. Silvers argued that Roy should not be held liable for the approximately $4 million in total fraudulent billings Selectcare submitted, noting that "only 63 percent of the submissions were paid" and

emphasizing that "there [was] no evidence that there was ever an intent or expectation on Mr. Roy's behalf that more than 63 percent of the submissions would be paid." *Id.* at 4. Silvers further contended that Roy was aware that "Medicare only pays a fraction of submissions" and thus did not intend that "Selectcare would receive $4 million." *Ibid.*

Silvers conceded, however, that the total loss could have been as much as $3.5 million, which would "not change the 18-level enhancement." *Ibid.*; *see also id.*, Dkt. 245 at 5-6 (summarizing her argument as to the loss calculation). In making her arguments, Silvers relied primarily on a PowerPoint presentation given by Deloitte & Touche LLP at the 2008 annual meeting of the Association of Healthcare Internal Auditors, which, she contended, showed that a substantial fraction of claims submitted to Medicare are denied. *Id.*, Dkt. 193-2; *see also id.*, Dkt. 245 at 7-8 (referencing the presentation). Silvers acknowledged at the sentencing hearing, held on May 29, 2015, that Roy did not attend this presentation, but contended that "[i]t's just support for what I submit … is common knowledge." *Id.*, Dkt. 245 at 8.

The court rejected Silvers's argument, holding under *United States v. Sutton*, 582 F.3d 781 (7th Cir. 2009), and *United States v. Mikos*, 539 F.3d 706 (7th Cir. 2008), that "the amount billed is prima facie evidence of the amount of the loss that the defendant intended to cause unless there is evidence of the defendant's subjective intent to bill a lesser amount." *Roy*, 13 CR 377, Dkt. 245 at 10. The court found that Roy, together with Desai and Patel, "structured the claims to Medicare to maximize the recovery and to minimize the risk of drawing attention to their scheme." *Ibid.* The court stated, however, that "whether the intended loss is 4 million or 3.5 million isn't going to move the needle at all in terms of the sentence that's going to be imposed, adding that "[i]t doesn't affect the Guidelines calculation, and it does not affect in any

way my consideration of all the facts and circumstances of this case under [18 U.S.C.

§] 3553(a)." *Id.*, Dkt. 245 at 10-11.

Adopting the PSR's calculation of Roy's base offense level (30) and criminal history

category (I), the court calculated the advisory Guidelines range as 97-121 months' imprisonment.

*Id.*, Dkt. 189 at 18; *id.*, Dkt. 245 at 49. In imposing a custodial sentence of 75 months, which

varied downward roughly twenty-five percent from the low end of the range, the court cited "a

number of reasons," including "[t]he zero convictions, the zero arrests, the fact that this is his

first incarceration, also the family support that he has from his wife." *Id.*, Dkt. 245 at 55.

Significantly, the court explained that any sentence less than 75 months would not be sufficient

given "[t]he duration of the scheme … [and] the cynicism that was at its inception. This was not

a momentary slip, a momentary lapse of judgment, but it was a sustained course of conduct that

was Mr. Roy's idea." *Ibid.* The court added that the evidence showed a significant amount of

"planning," a large "number of victims"—the Medicare recipients whose names were used in the

fake billing and who were greatly inconvenienced and stressed in the aftermath—the

"destruction of evidence in an attempt to hide the crime," and the fact that the defendants stole

over $2.5 million in a two-month period. *Ibid.* The court also observed with disapproval Roy's

failure to accept responsibility or to express remorse. *Id.*, Dkt. 245 at 47, 56.

## Discussion

### I.     Trial Counsel

Roy contends that Palomares provided ineffective assistance by "sabotag[ing]" plea

negotiations with the government. Doc. 79 at 2. On Roy's account, Palomares not only

consistently proposed unreasonable and unrealistic terms to the government, but also kept him in

the dark as to the government's view of the seriousness of the offense. Roy contends further that

the fee structure set forth in the engagement letter—whereby Palomares stood to receive an additional $50,000 by trying the case—created a conflict of interest, as Palomares needed funds for his congressional campaign and thus had an incentive to ensure that Roy did not plead. *Id*. at 18. With "competent counsel … negotiat[ing] in his client's best interests and in an objectively reasonable manner," Roy contends that he would have received a substantially shorter sentence—either 44 months (had the court accepted that the losses did not exceed $2.5 million) or 54 months (had the court simply applied a three-level decrease for acceptance of responsibility)—rather than the 75 months he received. Doc. 7 at 3; Doc. 79 at 28-29.

As noted, § 2255 "allows a prisoner in federal custody to move for relief on 'the ground that the sentence was imposed in violation of the Constitution or laws of the United States.'" *Brock-Miller v. United States*, 887 F.3d 298, 304 (7th Cir. 2018) (quoting 28 U.S.C. § 2255(a)). Here, the Sixth Amendment serves as the constitutional hook, granting the "right to effective assistance of counsel," which "encompasses 'a correlative right to representation that is free from conflicts of interest.'" *Blake v. United States*, 723 F.3d 870, 880 (7th Cir. 2013) (quoting *Wood v. Georgia*, 450 U.S. 261, 271 (1981)). The parties agree that the right to effective assistance of counsel applies to plea bargaining, just as it does at trial. *See Missouri v. Frye*, 566 U.S. 134, 143 (2012) ("[P]lea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages."); *Brock-Miller*, 887 F.3d at 307 (holding that the "Sixth Amendment right to counsel[] '… extends to the plea-bargaining process'") (quoting *Lafler v. Cooper*, 566 U.S. 156, 162 (2012)). "In the plea-bargaining context, '… a reasonably competent lawyer will attempt to learn all of the relevant facts of the case, make an estimate of a likely

sentence, and communicate the results of that analysis to the client before allowing the client to plead guilty.'" *Spiller v. United States*, 855 F.3d 751, 755 (7th Cir. 2017) (quoting *Bethel v. United States*, 458 F.3d 711, 717 (7th Cir. 2006)); *see also Estremera v. United States*, 724 F.3d 773, 778 (7th Cir. 2013) (holding that *Lafler* requires that "lawyers … tell their clients about offers of plea bargains" and "assum[ing] … that counsel's obligation entails explaining the material terms of the prosecutor's offer"); *Overstreet v. Wilson*, 686 F.3d 404, 406-07 (7th Cir. 2012) (assuming, without deciding, that an attorney "furnish[es] ineffective assistance by failing to convey a plea offer effectively") (internal quotation marks omitted).

"Two frameworks exist for analyzing ineffective assistance claims … ." *Blake*, 723 F.3d at 880. "One framework applies if defense counsel labored under an 'actual' conflict of interest," *ibid.*, under *Cuyler v. Sullivan*, 446 U.S. 335 (1980), meaning that "defense counsel was faced with a choice between advancing his own interests above those of his client," *Freeman v. Chandler*, 645 F.3d 863, 869 (7th Cir. 2011) (internal quotation marks omitted); *see also Daniels v. United States*, 54 F.3d 290, 294 (7th Cir. 1995) ("A conflict of interest arises when the defense attorney is required to make a choice advancing his own interests to the detriment of his client's interests.") (alterations and internal quotation marks omitted). When there is an actual conflict of interest, the defendant must "show an adverse effect [stemming from the conflict] by demonstrating 'that there is a reasonable likelihood that his counsel's performance would have been different had there been no conflict of interest.'" *Blake*, 723 F.3d at 880 (quoting *Hall v. United States*, 371 F.3d 969, 974 (7th Cir. 2004)); *see also Gonzales v. Mize*, 565 F.3d 373, 381 (7th Cir. 2009) ("An adverse effect is established by showing that 'but for the attorney's actual conflict of interest, there is a reasonable likelihood that counsel's performance somehow would have been different.'") (quoting *Stoia v. United States*, 22 F.3d 766, 771 (7th Cir. 1994)). Under

the second framework, which applies "where there has been no 'actual' conflict of interested alleged or shown, a petitioner must establish that the conflict resulted in ineffective assistance according to the familiar and more demanding … standard" set forth in *Strickland v. Washington*, 466 U.S. U.S. 668, 687-88 (1984), "whereby the defendant must demonstrate 'that counsel's representation fell below an objectively reasonable standard of care, and that there is a reasonable probability that but for counsel's unprofessional errors the trial outcome would have been different.'" *Blake*, 723 F.3d at 880 (quoting *Freeman*, 645 F.3d at 869). The court begins with *Sullivan* and then proceeds to *Strickland*.

### A. Whether Palomares's Fee Structure Created an Actual Conflict of Interest that Affected the Representation under *Sullivan*

For starters, it is far from clear that the *Sullivan* standard applies to financial conflicts of interest. True, in *Daniels*, 54 F.3d at 294, the Seventh Circuit recognized that "[a] conflict may … arise when a client's interests are adverse to his lawyer's pecuniary interests." But *Daniels* was decided before the Supreme Court cautioned in *Mickens v. Taylor*, 535 U.S. 162, 175 (2002), against an "expansive application" of *Sullivan*. Specifically, *Mickens* observed with disapproval that courts of appeals had "applied *Sullivan* unblinkingly to all kinds of alleged attorney ethical conflicts, … invok[ing] the *Sullivan* standard … even when representation of the defendant somehow implicates counsel's personal or financial interests, including a book deal, a job with the prosecutor's office, the teaching of classes to Internal Revenue Service agents, a romantic entanglement with the prosecutor, or fear of antagonizing the trial judge." *Id.* at 174-75 (citations and internal quotation marks omitted). Emphasizing that "[n]ot all attorney conflicts present comparable difficulties," *Mickens* cautioned that "the language of *Sullivan* itself does not clearly establish, or indeed even support, such expansive application." *Id.* at 175.

In light of *Mickens*, the Ninth Circuit has suggested that "the mere fact that counsel has a profit motive in a representation is insufficient to show that counsel's interests came in direct conflict with those of the client." *United States v. Walter-Eze*, 869 F.3d 891, 902 (9th Cir. 2017). Other circuits have similarly read *Mickens* to limit *Sullivan*'s reach. *See*, *e.g.*, *United States v. Oliver*, 406 F. App'x 808, 811 (4th Cir. 2011) ("A fee dispute does not ordinarily establish an actual conflict because courts presume that counsel will continue to execute their professional and ethical duty to zealously represent their clients, notwithstanding the fee dispute.") (alterations and internal quotation marks omitted); *Hand v. Sec'y, Dep't of Corr.*, 305 F. App'x 547, 550 (11th Cir. 2008) ("Since *Sullivan*, the Supreme Court has clarified that whether [it] applies outside of the scope of multiple concurrent representation is an open question.") (citing *Mickens*, 535 U.S. at 175-76); *Tueros v. Greiner*, 343 F.3d 587, 594 (2d Cir. 2003) ("Tueros alleges a conflict between duties owed to more than one person, not a conflict between a client's interests and the lawyer's self-interest, the most common type of case in which courts have held that *Strickland* rather than *Sullivan* should apply."); *United States v. Newell*, 315 F.3d 510, 516 (5th Cir. 2002) ("*Strickland* [not *Sullivan*] more appropriately gauges an attorney's conflict of interest that springs not from multiple client representation but from a conflict between the attorney's personal interest and that of his client.") (internal quotation marks omitted). Nevertheless, even assuming that *Sullivan* does apply here, Roy fails to carry his burden of showing an adverse effect—that is, of showing that Palomares's "performance of his duties on behalf of" Roy would have been "different" had a different fee arrangement been in place, one that did not result in Palomares being paid an additional $50,000 if the case were tried. *Blake*, 723 F.3d at 881.

## 1. Assessing the Credibility of Palomares and Roy

Determining whether there was an adverse effect turns in some measure on the credibility of Roy and Palomares. Each contends that the other is lying. Roy's story is that, from the outset, he conveyed to Palomares his desire to plead guilty, but that Palomares convinced him that he had effective defenses to the charges and, making matters worse, hid from him the government's view of the case. Doc. 70-2 at ¶ 9; Doc. 80-7 at 64 (Roy testifying that Palomares "felt very strongly that we had to go to trial, given … the issues with the tie-in or … the amount of dollars I got with the cashier's checks"); *id*. at 71 (Roy testifying that his "jaw dropped" when his § 2255 counsel showed him the government's plea offers and that he was "blown away that [Palomares] was willing to let [him] go to trial without explaining" his criminal exposure). According to Roy, had he "known that the government's plea offer was 87 to 100 whatever months," he would not have gone to trial, but rather would first have instructed Palomares "to negotiate down from that 87 months" and, if that failed, would have agreed "to sign the 87 months." Doc. 80-7 at 121.

Palomares's story, in contrast, is that Roy set the parameters of his negotiations with the prosecution. According to Palomares, Roy was unwilling to plead guilty to healthcare fraud or to accept a deal involving more than twenty-four months' imprisonment. Doc. 80-1 at 117; *see also id*. at 80, 140 (testifying that Roy initially "didn't want to spend any time in jail" and insisted on "pleading actual innocence"); *id*. at 180 (testifying that by May 2014, Roy was willing "take a plea for about 12 to 24 months"); *id*. at 182 (testifying that Roy was worried about the consequences for himself and his wife of a conviction for healthcare fraud). According to Palomares, he "submitted [to Roy] every offer that the government made" and tried to get Roy "the best deal possible." *Id*. at 116. Ultimately, Palomares testified, Roy was "willing to take

the risk of not pleading … because he knew he was looking at 85 to 103 months" if he did plea. *Id*. at 198-199.

Given the record evidence—including not only the exhibits, but also the court's observation of Palomares and Roy on the stand—the court finds Palomares's account to be the far more credible one. Before proceeding, Palomares's shortcomings must be acknowledged. At least one court has held that Palomares provided constitutionally ineffective assistance. *See Feliciano-Rodriguez v. United States*, 115 F. Supp. 3d 206, 224 (D.P.R. 2015), *appeal docketed*, No. 15-1964 (1st Cir. Aug. 27, 2015). Despite Palomares's testimony in this case that he would "put … in writing" anything that was "important," Doc. 80-1 at 69-71, there is no documentary evidence corroborating his recollection that he discussed the substance of each government plea offer with Roy. Palomares at times also failed to make timely filings in Roy's criminal case. Doc. 80-1 at 87-88; Doc. 88-13. Moreover, Palomares's negotiating strategy with the government was unlikely to yield positive results—though, to be fair, he had been dealt a very poor hand and thus had little to work with.

All that said, the court finds incredible Roy's account of his involvement in his own defense. Roy was not an unsophisticated defendant. He not only was highly educated, with a postgraduate degree from MIT, but also had prior experience in selecting attorneys to do legal work for Selectcare. Doc. 80-7 at 81-83. He represents himself as having advanced proficiency with "Medicare fee schedule[s]," further reflecting a high degree of sophistication. Doc. 70-2 at ¶ 2. Before engaging Palomares, Roy was represented by two experienced defense attorneys, Burke and Feld, each of whom spent substantial time on his case, Doc. 80-18 at ¶ 8; Gov't Exh. Feld Dec., including attending a proffer session with the government, Doc. 80-7 at 92, 94; Doc. 80-18 at ¶¶ 10-11; Gov't Exh. Feld Dec. Both Burke and Feld thus surely conveyed to Roy the

strength of the government's case. Doc. 80-18 at ¶ 11 (Burke averring that "the government had substantial incriminating evidence against Mr. Roy … and would require a felony plea with no agreement on a sentence"). In fact, Roy acknowledges that a third attorney advised him to plead guilty. Doc. 70-2 at ¶ 5; Doc. 80-7 at 97. And if Palomares, as Roy contends, falsely represented himself as having graduated from Northwestern University Law School in Chicago, Doc. 70-2 at ¶ 4; Doc. 70-3 at ¶ 4, Roy could have verified that representation with a simple Google search, Doc. 7 at 4 n.1 (noting that Palomares's website states that he received his law degree from "Northwestern California University, School of Law").

Against this backdrop, the court cannot credit Roy's testimony that he was an unwitting victim of Palomares's scheme to extract an additional $50,000 from him by sabotaging plea negotiations with the government. Simply put, the court does not believe that, over a fourteen-month period from May 2013 to July 2014, someone with Roy's intelligence, background, and experience regularly hand-delivered installment payments of some $100,000 in fees either by check or cash, Doc. 70-2 at ¶ 15; Doc. 80-1 at 152-155, 187; Doc. 80-7 at 58, 112-113; Gov't Exh. Payments to Palomares, without ever asking how plea negotiations were progressing or why it was taking so long to negotiate a deal. Roy had already been represented by two different and experienced lawyers; had Palomares's strategy been unacceptable to him, he surely would have terminated the representation or at least questioned Palomares's strategic choices.

Moreover, the documentary evidence confirms that Palomares kept Roy abreast by email of his negotiations with the prosecution team. *E.g.*, Doc. 70-3 at ¶ 10 (Sharmeen acknowledging that Roy's email in-box contained the emails from Madden attaching the government's first two written plea offers); Doc. 70-4 at 2 (Palomares forwarding Roy the government's third plea offer on July 7, 2014); Doc. 70-5 at 2 (same). Indeed, at least as of late May 2014 and continuing

through the beginning of trial in July 2014, Roy knew exactly what the government's position was—and what Palomares was offering to agree to on his behalf—because Palomares consistently forwarded Roy his correspondence with the prosecution team. Doc. 70-4 at 2; Doc. 70-5 at 2; Doc. 80-13 at 1; Doc. 88-2 at 1; Doc. 88-3 at 1; Doc. 88-17 at 1; Gov't Exh. May 28, 2014 @ 1:36. The court notes in this regard that Roy has walked back his initial averments, Doc. 9-1 at ¶ 12, that Palomares did not forward him any of the government's three written plea offers and that he learned about each of them only after filing his § 2255 petition. As Roy was forced to admit in his amended § 2255 declaration, Palomares did, in fact, send him the government's third written plea offer. Doc. 70; Doc. 70-2 at ¶ 11-12. Roy's initial inaccuracy (at best) or fabrication (at worst) damaged his credibility.

According to Roy, although he received the emails from Palomares, he did not typically scroll down to read their substance. Doc. 80-7 at 70-71, 125-126, 130-132. But this, too, is unworthy of belief. Before this case, Roy had never been arrested, let alone incarcerated. Doc. 80-7 at 110-111. It strains credulity that Roy would not have taken the time to process—and to ask questions about—the communications Palomares sent him reflecting the government's view of his case, especially in the weeks leading up to trial.

In sum, the record convincingly demonstrates that Roy knew about the government's written plea offers, particularly the third one, and the clear implication is that *he* chose not to accept them. Particularly given the evidence that Palomares used information from Roy to question the strength of the government's case—including raising reasons to doubt the credibility of Desai and Patel, *see, e.g.*, Gov't Exh. June 12, 2013 at 1—the court finds that Palomares undertook the negotiation strategy with Roy's approval and that he must have discussed with Roy each of the government's plea offers.

## 2.    Application of the Actual Conflict Standard

As noted, Roy's burden under *Sullivan* is to show that the conflict created by his fee arrangement with Palomares "had an adverse effect on [Palomares's] performance"—that is, "[1] a reasonable likelihood that [Palomares's] performance would have been different [2] had there been no conflict of interest." *Hall*, 371 F.3d at 973-74; *see also Gonzales*, 565 F.3d at 381 ("An adverse effect is established by showing that *but for* the attorney's actual conflict of interest, there is a reasonable likelihood that counsel's performance somehow would have been different.") (emphasis added) (internal quotation marks omitted); *Walter-Eze*, 869 F.3d at 901 (holding that the defendant's burden is to "show that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was … not undertaken due to the attorney's other loyalties or interests") (internal quotation marks omitted).

Although Palomares's version of events is far more credible, Roy satisfies the first prong of the *Sullivan* inquiry by showing that Palomares plausibly could "have acted differently." *Hall*, 371 F.3d at 975; *see also Gonzales*, 565 F.3d at 381 (same). Palomares could have more strenuously impressed on Roy the importance of accepting the government's offer to plead guilty to the first count and then focused at sentencing on persuading the court of the genuineness of his remorse or his efforts to atone for the fraud. Moreover, Palomares could have attempted to diminish the total losses attributable to Roy during sentencing, although, for reasons explained below, he would likely not have succeeded and might in fact have harmed Roy's case in the process. But despite the flaws in Palomares's approach, Roy cannot satisfy the second, causation-focused *Sullivan* prong because the evidence—given the court's credibility findings—refutes the notion that Palomares pursued that approach *because of* the fee arrangement. *See Gonzales*, 565 F.3d at 381 (requiring that the defendant show that his attorney would have

pursued a different approach "but for the attorney's actual conflict of interest") (internal quotation marks omitted).

Contrary to Roy's submission, the emails from the prosecution team that Palomares forwarded to Roy are persuasive evidence that Palomares undertook plea negotiations in good faith. Were Roy the hapless victim and Palomares the cynical manipulator, Palomares would not have revealed to Roy exactly how seriously the government viewed his alleged crimes or forwarded Roy additional discovery material with the instruction to "[p]lease read about your codefendants." Gov't Exh. May 28, 2014 @ 1:36. Roy retorts that it "makes no sense" that Palomares told the government on July 3, 2014 that Roy "had yet to make a decision" about pleading guilty to the indictment's first count if, in fact, Roy had already concluded that he wanted to go to trial. Doc. 88 at 7 (citing Doc. 80-1 at 200). But that is not true. By far the most plausible view of the evidence is that Palomares sought to keep negotiations open by suggesting that Roy was still considering the possibility of accepting the government's offer.

Moreover, as noted, the court cannot credit Roy's testimony that he had fairly "minimal" substantive contact with Palomares, Doc. 80-7 at 59, 73, 111-113, given the length of the representation, the stakes, the sums Roy paid Palomares, the methods of payment, and Roy's level of sophistication. While the prospect that the government would agree to an arrangement whereby Roy would plead guilty to misprision of felony and a substantially reduced loss amount was unrealistic, it is not clear that Palomares could have secured a deal for Roy involving a plea to something other than healthcare fraud or to no more than twenty-four months' imprisonment without first making offers that the government was likely to reject; that is how negotiation works. Roy always knew that pleading guilty was an option.

The conclusion that follows is that Palomares pursued his negotiating strategy—with Roy's approval—in an effort to strike a plea deal with the government that satisfied Roy's parameters. Doc. 80-1 at 66, 143-145, 150. Roy thus has failed to show the required adverse effect from the conflict that he contends the fee structure created. *See Blake*, 723 F.3d at 882 ("To the extent that Blake contends that [his initial attorney] was incented to cooperate with the government or that he acted in a manner he would not otherwise have done to the detriment of Blake's interests, there simply is no evidence to support such arguments."); *Moore v. United States*, 2017 WL 3738440, at *5 (D. Md. 2017) ("Having observed [Attorney] McDaniel's demeanor in testifying, and upon consideration of the evidence presented at the hearing, the Court concludes that McDaniel testified credibly that he recommended a bench trial for strategic reasons, not economic reasons.").

## B. Whether Palomares Rendered Ineffective Assistance under *Strickland*

Roy fares no better under *Strickland*'s "more demanding" standard, *Blake*, 723 F.3d at 880, which requires that he show that (1) Palomares's performance was deficient and (2) he was prejudiced as a result, *see Carter v. Douma*, 796 F.3d 726, 735 (7th Cir. 2015) (citing *Harrington v. Richter*, 562 U.S. 86, 104 (2011)); *Fluker v. United States*, 2016 WL 1613464, at *2 (N.D. Ill. Apr. 22, 2016), *cert. of app. denied*, 2017 WL 5952276 (7th Cir. Mar. 22, 2017). Where, as here, the defendant alleges ineffective assistance in the plea context, showing prejudice requires demonstrating "a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time." *Frye*, 566 U.S. at 147; *see also Lafler*, 566 U.S. at 164 ("[A] defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court

would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed."); *Brock-Miller*, 887 F.3d at 312 (same). "[I]n determining whether a petitioner has shown prejudice, courts may consider evidence about the actual decision-making process, provided that it is part of the sentencing record." *Campbell v. Smith*, 770 F.3d 540, 550 (7th Cir. 2014) (citing *Strickland*, 466 U.S. at 695).

For the reasons already given, the court doubts that Palomares's assistance was constitutionally ineffective, as the record shows that it was not Palomares's advice—but Roy's own wishes—that led him to reject the government's offers. But even assuming Roy has satisfied his burden under *Strickland*'s first prong, he fails to show prejudice.

The government concedes that, had Roy accepted the government's third written plea offer, his total offense level would have been no higher than 27, as he would have benefited from a three-level reduction for acceptance of responsibility from the offense level of 30 that the Probation Office calculated and that the court accepted at sentencing. Doc. 14 at 17; *see Roy*, 13 CR 377, Dkt. 245 at 24. Roy contends that competent counsel would have sought to persuade the government to "agree to disagree" about the loss amount—and that at sentencing, competent counsel would then have shown that he was responsible for less than $2.5 million in losses because he knew that Medicare would "reimburse no more than 60% of the $4,000,000 in false claims that Selectcare submitted to it" and because, together with Desai and Patel, he structured the fraudulent billings so that private "secondary insurers like [Blue Cross]" would never "even receive[] the false claims." Doc. 7 at 50, 54; Doc. 79 at 28. Accordingly, Roy contends that competent counsel would have ensured that Roy's total offense level was 25, a further two-level reduction. Doc. 7 at 57; Doc. 79 at 28.

The result, Roy submits, would have been an advisory Guidelines range of 57-71 months' imprisonment. Doc. 7 at 3, 56-57. Given that the court gave Roy a twenty-three percent variance from the low end of the actual Guidelines range of 97-121 months, Roy contends that the court would have sentenced Roy to 44 months' imprisonment, representing an equivalent variance from the low end of the new range. *Ibid.* He contends in the alternative that even if the court had rejected this argument and found that he was responsible for more than $2.5 million in losses, the applicable advisory Guidelines range would have been 70-87 months, accounting for the three-level decrease for acceptance of responsibility. Doc. 79 at 28-29. Again applying the same twenty-three percent variance, Roy contends that he would have received a sentence of at most 54 months. *Ibid.*

Roy's conclusion stems from a fundamentally flawed premise—that the court would have given him the same variance from the low end of the applicable Guidelines range if he had argued during sentencing that he was, in fact, more sophisticated about Medicare billing than he represented at the time. True, the court justified the variance in part on Roy's limited criminal history. *Roy*, 13 CR 377, Dkt. 245 at 54-55. But in imposing a 75-month sentence, the court expressly stated that "anything less than that [specific term of imprisonment] would not be sufficient to fulfill the purposes of [§ 3553(a)]," emphasizing "[t]he duration of the scheme, the planning that went into it, [and] the cynicism that was at its inception," and characterizing the scheme as "a sustained course of conduct that was Mr. Roy's idea." *Ibid.* Given the court's express statement that nothing less than 75 months would be sufficient under § 3553(a), Roy has not shown that it was reasonably probable that he would have received a *lower* sentence had he shown himself to be even *more* canny about Medicare reimbursement rates than indicated by the evidence that the court considered during sentencing. *See Hicks v. United States*, 886 F.3d 648,

651-52 (7th Cir. 2018) (holding that the petitioner did not show *Strickland* prejudice, reasoning that the sentencing court would not have "varied even further downward if the low end of the guideline range had been [different]" because "all indications are that 30 years was the sentence [it] thought appropriate under 18 U.S.C. § 3553(a)," and observing that "[u]nlike demonstrating an error in the guideline calculation, speculating about what might have been is not sufficient to show a reasonable probability of a different outcome"); *United States v. Smith*, 2014 WL 2459671, at *6 (N.D. Ill. June 2, 2014) ("[T]he judge imposed a sentence significantly below the low end of [the applicable Guideline] range, namely 168 months. … There is no basis in the record or otherwise to believe that the sentencing judge would have imposed a still lower sentence had Smith admitted to being the big-time drug trafficker that a 1500 kilogram quantity would have entailed.  The Court concludes that Smith has failed to show a reasonable probability of a lower sentence under that scenario.").

* * *

In sum, because Roy satisfies neither the *Sullivan* standard nor the *Strickland* standard, his § 2255 challenges to the performance of trial counsel fail.

## II.     Sentencing Counsel

Roy faults his sentencing counsel, Silvers, for many of the same reasons, arguing that her performance fails to satisfy *Strickland*.  Specifically, Roy contends that Silvers was deficient in conceding during sentencing that the loss from Roy's fraud scheme exceeded $2.5 million (even though she advanced a similar argument about losses to the one that Roy now contends should have been made) and, relatedly, in failing to hire an expert on Medicare reimbursement rates, instead choosing to rely on a Deloitte & Touche LLP PowerPoint presentation.  Doc. 7 at 60-64. For the reasons given above as to the effect of Palomares's representation on Roy's ultimate

sentence, Roy was not prejudiced at sentencing by Silvers's representation, and so has not satisfied *Strickland*'s second prong.

Roy also contends that Silvers was deficient in failing to argue that joint and several liability does not apply to the forfeiture ordered against Roy under 18 U.S.C. § 982(a)(7). *Id.* at 65; *Roy*, 13 CR 377, Dkt. 200. Acknowledging that, at the time of his sentencing, the Supreme Court had yet to decide *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), which held that joint and several liability does not apply to forfeiture proceedings under 21 U.S.C. § 853(a), Roy contends that there was a circuit split on the question, which should have put Silvers on notice of the issue. *Ibid*.

The trouble with this argument is that *Honeycutt* interpreted an entirely different forfeiture statute, 21 U.S.C. § 853(a), from the one applicable to Roy, 18 U.S.C. § 982(a)(7). *Roy*, 13 CR 377, Dkt. 200. That matters because *Honeycutt* relied on the plain text of § 853(a) in holding that the statute did not allow for joint and several liability. *See* 137 S. Ct. at 1632-33 (relying primarily on the use of "obtained" in § 853(a)). Section 853(a) provides: "Any person convicted of [a drug crime] punishable by imprisonment for more than one year shall forfeit to the United States … (1) any property constituting, or derived from, any proceeds *the person obtained*, directly or indirectly, as the result of such violation; (2) any of *the person's property* used, or intended to be used … to commit, or to facilitate the commission of, such violation; and (3) … any of *his* interest in, claims against, and property or contractual rights affording a source of control over, the continuing criminal enterprise." 21 U.S.C. § 853(a) (emphases added). "These provisions," the Supreme Court held, not only "limit forfeiture under § 853 to tainted property," but also "define[] forfeitable property solely in terms of personal possession or use." *Honeycutt*, 137 S. Ct. at 1632.

The text of § 982(a)(7) is materially different, providing: "The court, in imposing sentence on a person convicted of a Federal health care offense, shall order the person to forfeit property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds *traceable* to the commission of the offense." 18 U.S.C. § 982(a)(7) (emphasis added). Because § 982(a)(7), unlike § 853(a), does not tie forfeiture to "personal possession or use"— nowhere using any form of "obtain," but instead using "traceable"—it is not reasonably probable that, had Silvers made an argument that anticipated *Honeycutt*, she would have succeeded. *Compare United States v. Sexton*, 894 F.3d 787, 799 (6th Cir. 2018) (holding under 18 U.S.C. § 981(a)(1)(C), which, like § 982(a)(7), "does not contain the phrase 'person obtained,'" that "[w]hile property must be connected, or 'traceable' to the crime, it does not need to be property that the particular defendant received"), *with United States v. Chittenden*, 896 F.3d 633, 637 (4th Cir. 2018) (holding that *Honeycutt* applies to 18 U.S.C. § 982(a)(2), which "mirrors" the language of § 853(a)(1) in that it "likewise limits forfeiture to 'property constituting, or derived from, proceeds *the person obtained* directly or indirectly, as the result of' the crime'") (emphasis in original) (quoting 18 U.S.C. § 982(a)(2)).

Accordingly, Roy's contention that Silvers provided ineffective assistance of counsel under *Strickland* fails because he has not shown that the "likelihood of a different outcome" as to the court's forfeiture order was "'substantial, not just conceivable.'" *Carter*, 796 F.3d at 737 (quoting *Richter*, 562 U.S. at 112); *see also Rivas*, 2018 WL 3046951, at *8 (holding that the defendant failed to show *Strickland* prejudice where the sentence would have been the same); *Polanco*, 2017 WL 3780592, at *10 (same); *Haywood*, 2015 WL 5006003, at *6 (same).

**Conclusion**

Roy's § 2255 petition is denied. Under 2255 Rule 11(a), "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c); *White v. United States*, 745 F.3d 834, 835 (7th Cir. 2014). Under this standard, Roy must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (alterations and internal quotation marks omitted); *Lavin v. Rednour*, 641 F.3d 830, 832 (7th Cir. 2011) (same). Given the court's factual findings and the resulting weakness of his legal arguments, and the weakness of his legal arguments that do not turn on the court's factual findings, Roy has failed to make that showing here, so a certificate of appealability is denied.

December 20, 2018

_____
United States District Judge